**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN**

|  |  |
|---|---|
| AVOMEEN HOLDINGS, LLC, a Delaware limited liability company | No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| SHRI THANEDAR, an individual; and CHEMREAL LLC, a Michigan limited liability company | |
| Defendants. | |

## COMPLAINT

Plaintiff Avomeen Holdings, LLC ("Purchaser"), a Delaware limited liability company, by its attorneys, Perkins Coie LLP, and for its Complaint against Defendants, Shri Thanedar ("Thanedar"), an individual, and Chemreal LLC, a Michigan corporation ("Chemreal") (together, Thanedar and Chemreal are referred to as the "Selling Parties"), states as follows:

### NATURE OF THE CASE

1.     This action arises out of an equity purchase agreement under which Thanedar sold the majority interest in Avomeen, LLC, a Michigan limited liability company ("Avomeen"), to Purchaser.

2.     The transaction closed on November 7, 2016, following several months of negotiations and a due diligence period during which Thanedar provided information and made representations to Purchaser regarding Avomeen's business.

3.     However, Purchaser has discovered since closing that in the critical months leading up to close, Thanedar made fraudulent and misleading representations to Purchaser regarding Avomeen's financial practices and the nature and amount of Avomeen's monthly revenues and earnings.  Thanedar also instructed employees to make other changes to Avomeen's revenue recognition and reporting practices in furtherance of a scheme to defraud Purchaser into entering the transaction at a significantly inflated purchase price.

4.     As a result of Thanedar's material misrepresentations and fraud scheme, Thanedar presented Avomeen as a company with a stable, consistent, and growing revenue profile.  In reality, Avomeen's monthly revenues were inflated and highly variable.  Further, recognition of revenues was accelerated with Thanedar's knowledge and direction in an effort to present an attractive, albeit materially misleading, company profile to prospective investors.

5.     In the end, Thanedar's scheme successfully, but fraudulently, induced Purchaser to close the transaction and pay a higher amount for Seller's equity interest than it was worth.  Purchaser therefore seeks damages for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), the Michigan Uniform Securities Act ("MUSA"), the Delaware Securities Act, common law fraud, and breach of contract.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over Count I pursuant to § 27 of the Exchange Act [15 U.S.C. § 78j].  The claims asserted arise under § 10(b) of the Exchange Act [15 U.S.C. § 77t(b)] and SEC Rule 10b-5.

7.     This Court has supplemental jurisdiction over Counts II through VI pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this district because false and misleading representations underlying the claims were made in this district.

9.     The Selling Parties directly or indirectly made use of means or instruments of transportation and communication, and means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

## THE PARTIES

10.     Plaintiff Purchaser is a Delaware limited liability company located in Ann Arbor, Michigan.  As a result of the transaction at issue in this Complaint, Purchaser operates a full-service chemical testing laboratory that offers advanced product testing and development services for a variety of specialty, consumer, and industrial goods under the name Avomeen Analytical Services.

11.     Non-party Avomeen was a Michigan limited liability company located in Ann Arbor, Michigan.   Prior to the transaction at issue, Avomeen operated a business under the name Avomeen Analytical Services.

12.     Non-party High Street Capital IV SBIC, L.P. ("High Street Capital") is a private equity fund which, as a result of the transaction described herein, owns a majority interest in Purchaser.

13.     Defendant Thanedar is an individual who, upon information and belief, resides in Michigan.   Prior to the transaction at issue, Thanedar was the founder and sole owner and CEO of Avomeen through a revocable trust.   After the transaction, until February 24, 2017, Thanedar was the interim CEO of Purchaser.

14.     Defendant Chemreal is a Michigan limited liability located in Ann Arbor, Michigan.   Chemreal was created during the transaction at issue.   Thanedar is the sole owner of Chemreal through his revocable trust.   As a result of the transaction, Chemreal holds a minority interest in Purchaser.

## FACTUAL ALLEGATIONS

### Shri Thanedar, the Businessman

15.     Shri Thanedar has long held himself out as a sophisticated, knowledgeable businessman.   According to his website, https://shrithanedar.com/ (last visited November 11, 2017), Thanedar is "an award-winning entrepreneur" and a "best-selling author."

16.    Beginning in 1990, Thanedar grew a business in St. Louis Missouri called Chemir Analytical Services Inc. from a three-employee company to over 400 employees and a reported $63 million in annual sales.  However, news outlets in the St. Louis area report that Bank of America forced the close of that business in 2011.  At the time, the St. Louis Post-Dispatch quoted Thanedar as admitting "I'm no longer filthy rich" after a palatial mansion he lived on was foreclosed upon, and a 2016 article in the St. Louis Post-Dispatch quotes Thanedar as explaining that during that period he lost his "business, my home, cars.  I had a real Ferrari and a Rolls Royce Phantom."

17.    In total, Thanedar reports through his website (https://shrithanedar.com/about-2/, last visited November 11, 2017) that he has purchased or started eight different businesses since 1990, and "has achieved notable success in turning around troubled companies as well as in mergers and acquisitions (M&A) as a strategy to building successful businesses."  One of the businesses that he started was Avomeen, which Thanedar founded in 2010.

**The Marketing of Avomeen**

18.    Beginning in early 2016, Thanedar began marketing Avomeen for sale and/or investment.  Outside investment in Avomeen could help the company continue to grow but, more importantly for Thanedar, the purchase of Avomeen could provide Thanedar with a significant liquidity event.

19.    To help market Avomeen for outside investment, Thanedar retained Capstone Partners, LLC ("Capstone"), an investment banking firm.  In or around April 2016, Capstone created a Confidential Information Memorandum describing Avomeen and its business and financial attributes.

20.    The Confidential Information Memorandum, which was circulated to prospective investors and purchasers, included a number of representations about Avomeen's historical financial performance, and portrayed a company with strong, stable revenue growth that continued into early 2016.   For example, the Confidential Information Memorandum stated that "[r]evenue for the 1st quarter of [2016] totaled $2.7 million; a 51% increase over the level achieved in the same period of the prior year" and "Avomeen has achieved an impressive [Compound Annual Growth Rate] of over 49% from 2013 through 2015."

21.    On July 8, 2016, High Street Capital sent a Letter of Intent ("LOI") to Thanedar via Capstone.  In the LOI, High Street Capital proposed to purchase, through Purchaser, 60% of the equity interests in Avomeen.  The LOI proposed a pre-adjustment sale price of $30M plus an earn-out of up to $5M depending on the company's 2016 performance.

22.    Thanedar and Avomeen accepted the LOI on July 10, 2016.  Under the LOI, the contemplated transaction was subject to several conditions precedent,

including accounting and business due diligence as well as appropriate representations and warranties from Selling Parties.

**The Transaction**

23. The transaction was completed pursuant to an Equity Purchase Agreement dated as of November 7, 2016 between and among Purchaser, Thanedar and Chemreal. A copy of the Equity Purchase Agreement is attached as Exhibit 1. Contemporaneously, the Selling Parties entered into a Securities Agreement under which they agreed to transfer and sell certain securities in Avomeen in order to facilitate the transaction set forth in the Equity Purchase Agreement.

24. Under the Equity Purchase Agreement, Purchaser paid a pre-adjustment purchase price of $33,600,000 for the membership interests in Avomeen.

25. The Equity Purchase Agreement incorporated a Disclosure Statement which described certain exceptions to the representations and warranties contained in the Equity Purchase Agreement. A copy of certain excerpts from the Disclosure Statement is attached as Exhibit 2.

26. As a result of the transaction, Thanedar retained—through Chemreal—a minority interest in Purchaser, but received sale proceeds of approximately $20 million.

27.     Absent   Thanedar's   fraudulent   scheme   and   misrepresentations described herein, and if Thanedar had provided truthful information, Purchaser would not have closed the transaction.   Or, at most, Purchaser and its funders would have paid significantly less for the company, based on significantly lower revenues and at a lower multiple applied to EBITDA (i.e. earnings before interest, tax, depreciation and amortization).

**Thanedar's Misrepresentations Regarding Revenue Recognition
Practices During Diligence**

28.     As discussed in more detail below, in the period leading up to the closing of the transaction, Thanedar engaged in a scheme to fraudulently inflate Avomeen's reported revenues and hide significant month-to-month variability in revenue.   Thanedar also made false and misleading statements of material fact to High Street Capital, Purchaser, and their advisors regarding Avomeen's revenue recognition practices, and omitted material facts necessary to make statements not misleading.

29.     When evaluating a company, a purchaser or lender will often rely on revenue   and   earnings   information   to   determine   an   appropriate   valuation. Typically, a valuation will be calculated by taking a set multiple times the company's   EBITDA   (i.e.   earnings   before   interest,   tax,   depreciation   and amortization).   The multiple applied may vary across industry and by situation, and is impacted by the stability or variability of a company's revenue history and

growth profile.  For example, a company whose revenue is inconsistent month-to-month faces heightened risks and costs related to debt service and other aspects of month-to-month operations.  Thus, the stability and veracity of monthly revenue of a company is material to a purchaser, and in this case was material to High Street Capital and Purchaser, when determining whether to complete a transaction and analyzing value.

30.     After the LOI was accepted, High Street Capital retained accountants to assist with financial and tax due diligence in connection with the transaction.

31.     During the due diligence period, Avomeen provided Purchaser with historical financial reports and interim financial data through the close of September 2016.  The data provided by Avomeen showed generally consistent monthly revenues in 2016, with growth from $826,885 in January 2016 to $1,004,171 in September 2016.

32.     During the due diligence period, High Street Capital's and Purchaser's accountants asked Thanedar to confirm their understanding of Avomeen's revenue recognition practices, and specifically confirm whether Avomeen recognized 100 percent of revenue upon completion of a project.

33.   In an email dated August 25, 2016, Thanedar responded and specifically represented that:

> In reference to revenue recognition:
>
> Avomeen recognizes 100.0 percent of revenue upon completion of a project
>
> *The vast majority (90% or more) of Avomeen's revenue is recognized upon 100% completion of a project.* As referenced above, there are a few specific project types that are recognized as revenue before 100% completion:
>
> 1.      Full Time Equivalency (FTE) projects. Once an FTE project has met the required hours for the agreed upon time period in the signed quote and the deliverables has been sent, that portion of the project will be recognized as revenue. Example: Month 1 is completed of 3 month project and To Date deliverables have been sent to customer, revenue will be recognized for that period and the project is still ongoing.
>
> 2.      Large projects ($100,000 or greater) with well-established companies whose projects will span longer than 30 days whose specific milestones have been met and deliverables sent to the client, then revenue will be recognized and the project is still ongoing.
>
> 3.      Stability studies with time points extending out up to 6 months or longer will have revenue recognized at specific times in the future until the project is complete, as the project is still ongoing.

34.   Purchaser and its advisors relied on Thanedar's representations regarding revenue recognition as part of its diligence prior to close.  However, these representations turned out to be false.

35.   Moreover, the Selling Parties took additional steps to thwart efforts by Purchaser's accountants to obtain accurate information regarding the Selling Parties' revenue recognition practices during due diligence.   For example,

Thanedar mislead the accountants into believing that management was unable to provide actual documentation to confirm delivery of the company's services and that the invoice was the trigger for revenue recognition. After closing, Purchaser learned that this was false. In actuality, information about project completion in the form of emails for many projects could be found in the company's Salesforce and other records.

36. In addition, invoices were frequently back-dated to the last date of a period, rendering the use of invoices as an accurate trigger of proper revenue recognition fraudulent and ineffective and misleading. Upon information and belief, and based upon information disclosed after closing by key employees at the company, the back-dating of invoices was done with Thanedar's knowledge and pursuant to his direction regarding the recognition of revenue.

**Thanedar's Misrepresentations in the Equity Purchase Agreement**

37. In the Equity Purchase Agreement and associated Disclosure Statement, Thanedar made additional representations regarding Avomeen's financial reports and revenue recognition practices.

38. In Section 3.3(g)(i) of the Equity Purchase Agreement, the Selling Parties jointly and severally represented and warranted to Purchaser that the Disclosure Statement contained complete and accurate copies of the unaudited balance sheet and income and cash flows of the Company, on a consolidated basis,

as of and for the 9 month period ended on September 30, 2016 (the "Interim Financial Statements"). The Selling Parties further represented and warranted that the Interim Financial Statements "present fairly and accurately in all material respects the financial position of the Company, on a consolidated basis, as of the dates thereof and the results of operations and cash flows of the Company, on a consolidated basis, for the periods covered by said statements . . . all in accordance with GAAP, except as set forth on Schedule 3.3(g)(i)."

39.     In Schedule 3.3(g)(i) of the Disclosure Statement, the Selling Parties represented that the Financial Statements and Interim Financial Statements presented were "prepared in accordance with GAAP" with certain enumerated exceptions. One exception was that "Avomeen does not utilize the percentage of completion accounting method of work-in-progress evaluation for long term projects," which was consistent with and reinforced Thanedar's prior representation that the vast majority of Avomeen's revenue was recognized only upon 100% completion of a project.

40.     The Selling Parties further represented and warranted in Section 3.3(y) of the Equity Purchase Agreement that "the representations and warranties of Seller and Owner in this Agreement do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the representations, warranties or statements contained herein not misleading."

41.     The Selling Parties' representations and warranties as described above were false and fraudulent.  The Interim Financial Statements presented were not prepared in accordance with GAAP, and the monthly reported revenue and EBITDA during the nine-month period prior to close were inflated, inaccurate, and materially misleading.

42.     Instead of recognizing revenue at 100% project completion, in numerous cases Avomeen: (a) recognized project revenue before a project was complete; and/or (b) held open the closing of the books for a financial month and back-dated invoices to shift revenue into a prior month.  These practices which, upon information and belief, were done with Thanedar's knowledge and direction, had the effect of artificially inflating and smoothing revenue over the first nine months of 2016.  In essence, Thanedar falsely portrayed Avomeen as an entity with consistent, growing month-to-month revenue during the critical period leading up to Purchaser's investment transaction.

43.     For example, Selling Parties reported that Avomeen had revenue of $1,085,006 in July 2016, but an analysis of project delivery dates stored in the company's records shows that a significant portion of the reported revenue— hundreds of thousands of dollars—involved projects that were not actually completed until subsequent months.  The pattern continued in similar fashion in August 2016.  In September 2016, which was the last month for which Purchaser

had complete financial information as of the time of close, Purchaser is informed and believes that more than 40% of the revenue booked in September 2016 should have instead been recorded later in 2016 or 2017, if Thanedar's representations regarding Avomeen's revenue recognition practices actually had been accurate and truthful.

44.    In total, Purchaser is informed and believes that at least $750,000 of revenue was included on the Interim Financial Statements which, under GAAP and if Thanedar's representations had been correct, should have instead been booked by Avomeen as revenue in the fourth quarter of 2016 or even in 2017.  Seller's misleading presentation of Avomeen's financial reports had the effect of significantly and materially overstating Avomeen's nine-month EBITDA.  Because the majority of Avomeen's costs are labor expenses paid monthly, an overstatement of revenue leads to dollar-for-dollar overstatement of EBITDA, the financial metric most relied upon by Purchaser in its valuation of Avomeen.

**Thanedar's Scheme and Misrepresentations Were Intentional and Knowingly Made**

45.    Thanedar's statements of August 25, 2016 and the Selling Parties' statements in the Equity Purchase Agreement and Disclosure Statement were false and fraudulent.  Moreover, Thanedar knew, or had reason to know, that the statements were materially false and misleading.

46.     Based on Purchaser's investigation, review of business records, and reports from employees after close, and upon information and belief, Thanedar's knowing intent to deceive and mislead Purchaser is evidenced by the following, among other examples:

      a.  Thanedar kept various employees and groups of employees "siloed" from each other, providing limited, partial information and holding close control and reins of ultimate authority and full knowledge of the various aspects of the company operations;

      b.  Thanedar controlled the flow of information to Purchaser and its advisors in the period leading up to close, and specifically instructed certain employees not to contradict anything that was reported to potential investors even if it was not accurate;

      c.  Thanedar was involved in decisions to postpone the close of certain financial months to keep projected revenue from slipping into later months;

      d.  Thanedar personally controlled the issuance of credit memoranda to customers, which were usually issued in good performance months.  All credit memoranda had to be approved by Thanedar, regardless of amount, and credit memoranda would at times sit on Thanedar's desk for several months before they were approved;

      e.  At times, Thanedar would instruct bookkeeping staff to back date invoices, even if the invoice went out the following month, so that revenue could be recognized in prior months;

      f.  Thanedar was involved in decisions to count projects as part of a month's revenue even if the project was close to completion, but not actually complete;

      g.  Beginning in September 2016, immediately prior to the closing of the transaction, Thanedar personally instructed employees to adjust and relax the company's approach to recognizing

revenue, and to invoice and recognize projects that were 90% completed;

h.  Thanedar would ask key employees nearly every day how close the company was to hitting revenue targets, and he instructed employees to count projects for certain month's revenue even if completed late;

i.  Thanedar specifically told employees that the deal and the employee's corresponding transaction bonus would be jeopardized if monthly revenue targets were not hit; and

j.  Despite the foregoing, upon information and belief, Thanedar instructed the then-Chief Revenue Officer to falsely represent to interested purchasers—as Thanedar himself had represented to Purchaser—that revenues were invoiced and booked at 100% project completion.   Thanedar also specifically directed employees not to correct misstatements or errors made in presentations to prospective purchasers.

47.     Thanedar made other misrepresentations and changes to mislead Purchaser in the period leading up to closing as well, apparently recognizing that the Purchaser would have walked away from the deal if the true condition of the company were discovered.   For example, Avomeen maintained a record of "pending wins" each month that essentially reflected the company's pipeline of near-future work.   However, Thanedar instructed his employees in the month leading up to closing to broaden and relax the definition of a "pending win," in order to misrepresent to Purchaser a larger pipeline of future projects than would have existed under the previously-used definition of "pending win"—especially as compared to prior time periods.

48.     After Thanedar instructed his employees to make this change to the definition of "pending win", on November 2, 2016—just days prior to close—he emailed representatives of Purchaser acknowledging only that he had asked employees to "update" the company records, without explaining that as part of that "update" he had instructed a change to the historical understanding of a "win." Thanedar then advised Purchaser's representatives that "October appears to be our 'strongest win month' since inception of Avomeen in 2010." A significant portion of these "wins" failed to convert into post-closing revenue.

**After Closing, Thanedar Confirms That His Pre-Closing Representations Regarding Revenue Recognition Practices Were False**

49.     On March 3, 2017, in a letter disputing certain post-closing calculations that remain unresolved, the Selling Parties stated that "[i]t is Avomeen's practice that projects that are 90% or more completed in a month are billed in the end of that month." This statement, which is inconsistent with Thanedar's pre-closing representations and warranties, is further evidence that Thanedar's pre-closing representations were false and fraudulent and were made in order to induce Purchaser to close the transaction.

50.     On April 19, 2017, Purchaser submitted a demand to the Selling Parties for full rescission of the Equity Purchase Agreement and all related transactions or, in the alternative, for indemnity and damages under Section 6.1 of the Equity Purchase Agreement. The Selling Parties refused that demand.

**COUNT I**
**Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5 (Fraud)**

51.     Purchaser incorporates by reference Paragraphs 1-50 as this Paragraph 51.

52.     As alleged above, the Selling Parties made untrue statements of material fact relating to Avomeen's revenue recognition practices and the revenues and, by an equal amount, earnings of Avomeen for the nine-month period ending September 2016, and/or omitted to state a material fact necessary in order to make the statements made regarding those revenues and related practices not misleading.

53.     The Selling Parties directly or indirectly made use of means or instruments of transportation and communication, and means or instrumentalities of interstate commerce, or of the mails, in connection with the statements, transactions, acts, practices and courses of business alleged in this Complaint.

54.     The Selling Parties' statements were made in connection with the purchase or sale of securities.

55.     The Selling Parties' acted knowingly or severely recklessly in making such false statements, and with the intent that Purchaser rely on such false information.

56.     The Selling Parties' false statements of material fact relating to Avomeen's revenue recognition practices and the revenues and, by an equal amount, earnings of Avomeen proximately caused Purchaser damages, because

Purchaser was induced to close the transaction and paid an inflated purchase price for security interests in Avomeen.

57.     By reason of the foregoing, the Selling Parties violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT II
### Violation of MUSA

58.     Purchaser incorporates by reference Paragraphs 1-50 as this Paragraph 58.

59.     As alleged above, the Selling Parties made untrue statements of material fact relating to Avomeen's revenue recognition practices and the revenues and, by an equal amount, earnings of Avomeen for the nine-month period ending September 2016.

60.     By reason of the foregoing, the Selling Parties violated M.C.L. §§ 451.2501 and 2509.

61.     As a result, Purchaser is entitled to damages.

## COUNT III
### Violation of Delaware Securities Act

62.     Purchaser incorporates by reference Paragraphs 1-50 as this Paragraph 62.

63.     As alleged above, the Selling Parties made untrue statements of material fact relating to Avomeen's revenue recognition practices and the revenues and, by an equal amount, earnings of Avomeen for the nine-month period ending September 2016.

64.     By reason of the foregoing, the Selling Parties violated 8 Del. C. § 73-605.

65.     As a result, Purchaser is entitled to damages.

## COUNT IV
### Fraud in the Inducement

66.     Purchaser incorporates by reference Paragraphs 1-50 as this Paragraph 66.

67.     The Selling Parties knew at the time they made the false representations and concealed the material facts as alleged in Paragraphs 28-49 above that such representations were untrue and that they were concealing material facts from Purchaser.

68.     The Selling Parties acted with the intention to deceive and mislead the Purchaser to fraudulently induce Purchaser to purchase Avomeen, and of having Purchaser rely on the Selling Parties misrepresentations in deciding whether to enter into the transaction.

69.     Purchaser relied upon the Selling Parties material misrepresentations in deciding to move forward with the purchase of Avomeen.

70.     As a direct and proximate result of the defendants' actions as described above, the Purchaser suffered loss and damages, including but not limited to costs incurred in completing the transaction and in investigating the foregoing and damages equal to the difference between the actual value of Avomeen and the Purchase Price of Avomeen in connection with the underlying transaction.

## COUNT V
## Fraudulent Misrepresentation

71.     Purchaser incorporates by reference Paragraphs 1-50 as this Paragraph 71.

72.     The Selling Parties knew at the time they made the false representations and concealed the material facts as alleged in Paragraphs 28-48 above that such representations were untrue and that they were concealing material facts from Purchaser.

73.     The Selling Parties acted with the intention to deceive and mislead the Purchaser to pay a significantly higher price for Avomeen than it would have offered and paid if the true nature of Avomeen's revenue recognition practices and accurate revenues and earnings had been disclosed, and of having Purchaser rely

on the Selling Parties misrepresentations in deciding whether to enter into the transaction and at what price.

74.     Purchaser relied upon the Selling Parties material misrepresentations in deciding to move forward with the purchase of Avomeen at an artificially inflated valuation.

75.     As a direct and proximate result of the defendants' actions as described above, the Purchaser suffered loss and damages, including but not limited to costs incurred in completing the transaction and in investigating the foregoing and damages equal to the difference between the actual value of Avomeen and the Purchase Price of Avomeen in connection with the underlying transaction.

## COUNT VI
## Breach of Contract

76.     Purchaser incorporates by reference Paragraphs 1-50 as this Paragraph 76.

77.     In Section 3.3(g)(i) of the Equity Purchase Agreement, the Selling Parties jointly and severally represented and warranted to Purchaser that the Disclosure Statement contained complete and accurate copies of the Interim Financial Statements.

78.     The Selling Parties further represented and warranted that the Interim Financial Statements "present fairly and accurately in all material respects the

financial position of the Company, on a consolidated basis, as of the dates thereof and the results of operations and cash flows of the Company, on a consolidated basis, for the periods covered by said statements . . . all in accordance with GAAP, except as set forth on Schedule 3.3(g)(i)."

79.    In Schedule 3.3(g)(i) of the Disclosure Statement, the Selling Parties simply stated that the Company does not utilize percentage of completion accounting method.

80.    The Selling Parties further represented and warranted in Section 3.3(y) of the Equity Purchase Agreement that "the representations and warranties of Seller and Owner in this Agreement do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the representations, warranties or statements contained herein not misleading."

81.    The Selling Parties breached the agreement in that they continuously concealed and withheld from plaintiff the material facts regarding the revenue recognition practices of Avomeen and the true monthly revenues and earnings of the business.

82.    As a direct and proximate result of the defendants' breach of contract as described above, plaintiff suffered loss and damages, including but not limited to costs incurred in completing the transaction and in investigating the foregoing

and damages equal to the difference between the actual value of Avomeen and the Purchase Price of Avomeen in connection with the underlying transaction.

WHEREFORE, Plaintiff  requests that the court (1) award Avomeen Holdings, LLC compensatory damages in an amount to be awarded at trial, plus interest; (2) award Avomeen Holdings, LLC punitive damages in the amount to be awarded at trial; (3) award Avomeen Holdings, LLC its costs, together with reasonable attorney's fees; and (4) award plaintiff such other relief as the court may deem proper.

HICKEY HAUCK BISHOFF & JEFFERS, PLLC

By: ___/s/ Patrick F. Hickey_____
      Patrick F. Hickey (P36648)
      Benjamin W. Jeffers (P57161)
      Attorneys for Plaintiff
      One Woodward Avenue, Suite 2000
      Detroit, MI  38226
      313.964.8600
      phickey@hhbjlaw.com
      bjeffers@hhbjlaw.com

and

Perkins Coie LLP
By:  Jonathan R. Buck
Kathleen A. Stetsko
Co-Counsel for Plaintiff
131 S. Dearborn Street, Suite 1700
Chicago, IL  60603-5559
312.324.5644
jbuck@perkinscoie.com
kstetsko@perkinscoie.com

-25-

## **<ins>DEMAND FOR JURY TRIAL</ins>**

Plaintiff hereby demands trial by jury on all issues so triable.

HICKEY HAUCK BISHOFF & JEFFERS, PLLC

By: ___/s/ Patrick F. Hickey_____

       Patrick F. Hickey (P36648)
       Benjamin W. Jeffers (P57161)
       Attorneys for Plaintiff
       One Woodward Avenue, Suite 2000
       Detroit, MI  38226
       313.964.8600
       phickey@hhbjlaw.com
       bjeffers@hhbjlaw.com

and

Perkins Coie LLP
By:  Jonathan R. Buck
Kathleen A. Stetsko
Co-Counsel for Plaintiff
131 S. Dearborn Street, Suite 1700
Chicago, IL  60603-5559
312.324.5644
jbuck@perkinscoie.com
kstetsko@perkinscoie.com